IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-503

Filed 21 March 2023

Cabarrus County, No. 20-JT-109

IN THE MATTER OF: S.I.D.-M.

Appeal by petition for writ of certiorari by respondent-father from order entered 18 March 2022 by Judge Christy E. Wilhelm in District Court, Cabarrus County. Heard in the Court of Appeals 21 February 2023.

*Richard Croutharmel, for respondent-appellant-father.*

*No brief for petitioner-appellee-mother.*

STROUD, Chief Judge.

Respondent-father appeals from an order terminating his parental rights for willfully abandoning his child. Father argues he did not willfully abandon his child because he attempted to reach out to Mother by email, through the parties' attorneys, two weeks before the termination petition was filed. Because clear, cogent, and convincing evidence exists in the record to support the trial court's findings of fact, and the trial court's findings support its conclusion that the minor child was an abandoned juvenile, the trial court's termination of Father's parental rights is affirmed.

## I.    Background

Sidney[1] was born to Mother and Father in February 2018.  Mother and Father were never married.  In a previous custody proceeding in Mecklenburg County, Mother was granted full custody of Sidney with scheduled visitation for Father.  Venue of the custody proceeding was later transferred to Cabarrus County.

In early August 2019, Father "attempted suicide and was hospitalized for mental health purposes."  On 13 August 2019, Mother secured an *ex parte* custody order suspending Father's visitation.  Mother also filed a motion to modify visitation, and on 28 August 2019, the District Court in Cabarrus County entered a written order extending the *ex parte* order and suspending Father's visitation (the "Order Suspending Visitation") until he "presents himself to the Court and shows just cause as to why his visits should be reinstated."[2]  The relevant portions of the Order Suspending Visitation, which is not at issue on appeal, state:

**FINDING AS FACT**

. . . .

3.    An ex parte order was entered herein on or about August 13, 2019;

4.    The Cabarrus County Department of Social Services has opened an investigation and has been unable to locate the [Father];

---

[1] A pseudonym is used.

[2] The original custody order is not in the record on appeal, but the petition made detailed allegations regarding the Custody Order and the Order Suspending Visitation, and Father admitted these allegations in his answer.

     5.     Service by the Sheriff was returned unserved and [Mother] has no information regarding [Father]'s present whereabouts;

     6.     [Father]'s mental stability is in question and it would be contrary to the minor child's best interest for him to have visitation at this time.

Based on these Findings of Fact, the Court hereby makes the following:

**CONCLUSIONS OF LAW**

. . . .

     2.     This temporary order is in the best interest of the minor child.

And based on these Findings of Fact and Conclusions of Law:

**IT IS HEREBY ORDERED ADJUDGED AND DECREED** as follows:

     1.     [Father]'s visitation with the minor child [Sidney] is suspended until such time as he presents himself to the Court and shows just cause as to why his visits should be reinstated.

Father was unable to return to work for several months because of his mental health issues but his therapist eventually approved his return to work in March 2020.

On 24 July 2020, Mother filed a "Petition for Termination of Parental Rights" (the "Petition") in the District Court, Cabarrus County. The Petition recited basic facts about the parties, that Mother had full custody of Sidney and Father had visitation, and then alleged:

     7.     Petitioner alleges that the following facts

establish grounds for the [Father]'s parental rights to be terminated:

  a. Pursuant to 7B–1111(a)(4), [Father] has willfully failed without justification to adequately pay for the care, support, and education of the juvenile in that he has fallen behind on his child support obligation and currently has an arrearage of approximately $2,500.00.

  b. Pursuant to 7B–1111(a)(6), [Father] is incapable of providing for the proper care and supervision of the juvenile in that:

    i. On or about August 2, 2019, [Father] attempted suicide by jumping off [a bridge]. [Father] was saved by a Charlotte-Mecklenburg Police Officer. He was then escorted by ambulance to Novant–Mill Hill where he was hospitalized for a mental health evaluation.

  c. Pursuant to 7B–1111(a)(7), [Father] has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of this petition based upon the following:

    i. Respondent has not visited with the child since July 2019;

    ii. Since the Order on August 28, 2019, [Father] has not made any efforts to reach out to [Mother] about the minor child nor has he filed anything in the Chapter 50 Action to have his visitation reinstated;

    iii. Respondent has at all times known how to contact [Mother] either via phone or email. [Father] knows [Mother]'s residential address as well as how to contact [Mother]

through her family[.]

Father filed an answer 10 September 2020 admitting the allegations regarding the parties' and child's residences, the parties' status as parents of the child, and allegations regarding the prior custody action and the Order Suspending Visitation. Father denied the remaining allegations of the Petition. As to the grounds for termination, Father's answer stated:

> 7. The allegations contained in Paragraph 7 are denied.
>     a. Denied as to willfulness. [Father] was out of work following his mental health crisis and began to resume his child support payments upon returning to work.
>     b. Admitted as to the incident [of attempted suicide], but denied as to a continual issue that would render [Father] incapable of providing for the proper care and supervision of the juvenile following his treatment after his mental health crisis.
>     c. Denied as to willfulness.
>         i. Admitted as to time [Father] has not seen his child.
>         ii. Denied. [Father] obtained counsel and reached out via counsel as to what documentation was needed to resume visits on July 13, 2020 and Petitioner responded by filing to terminate his rights on July 23, 2020.
>         iii. [Father] has [Mother's] email and was communicating with her via email through at least August 2019 about their child.

A Guardian *ad litem* ("GAL") was appointed 15 September 2020 and the hearing was

continued until 27 October 2020.[3]  The Termination of Parental Rights ("TPR") hearing was then repeatedly continued before ultimately being set for 21 February 2022.

Our dissenting colleague notes that the TPR hearing was "inexplicably" delayed, and while we agree the record does not fully explain all the continuances, it does include all the relevant motions and orders.  We also note Father did not raise any argument on appeal as to any continuance or the trial court's denial of his motion to continue filed just before the final hearing.  In fact, the delay would have served only to benefit Father, as it gave him more time and opportunity to demonstrate his concern for the child by requesting an opportunity to see or communicate with her, seeking information regarding her development and welfare, or sending gifts or cards.

According to the record, on 27 October 2020, both parents, their counsel, and the GAL were present and the Pretrial Order was entered; the date of the TPR hearing was to be determined.  On 20 April 2021, a "status review" hearing was set for 11 May 2021.  At the 11 May 2021 hearing, a continuance order was issued for purposes of the GAL report and hearing was set for 25 May 2021.  At the 25 May 2021 hearing, the hearing was continued to 6 July 2021 for purposes of review of the status

---

[3] At the TPR hearing both parties reference a motion Father apparently made September 2020 to attempt to resume visitation.  The trial court's TPR order also references this motion.  The record does not contain this motion and the evidence presented at the hearing did not address the details of the motion or the disposition, if any.  The only document filed by Father in September 2020 in the record is Father's answer.

of the GAL report and the hearing was "continued for Dom Setting Request" and set for 6 July 2021. On 4 June 2021, Mother's counsel filed a "Juvenile Case Request for Setting," and on 15 June 2021, the Chief District Court Judge set the matter for hearing on 26 August 2021. On or about 24 August 2021, Father filed an "Objection to Holding Audio-Video Hearing and Motion to Continue" to the hearing set for 26 August 2021. According to Father's Motion to Continue, the hearing had been set as an in-person hearing but on 23 August 2021, Mother's counsel "notified the Court of a health issue that would prevent her client from attending the hearing in person." Father informally objected by email to a remote hearing, but then received an order setting the hearing as a WebEx hearing on the originally-scheduled date of 26 August 2021. Father objected to a remote hearing for various reasons and requested that the case be continued "until such time as it is safe for the matter to be heard in person." On 24 August 2021, the trial court entered an order denying Father's motion to continue. The trial court found that the minor child had tested positive for COVID and the parties had attempted to find an alternative in-person hearing date within the following 30 days but were unable to find a suitable date. The trial court denied continuance to avoid further delay. However, on 26 August 2021, the trial court entered a Continuance Order noting Mother's COVID exposure and that both attorneys had agreed to continue the hearing to 12 October 2021. On 12 October 2021, the trial court entered an "Order Continuing Case Off Calendar" finding Father's attorney made a motion to continue in open court and Mother's attorney

consented to continue to a new date to be determined. On the same day, Mother's attorney filed a "Juvenile Case Request for Setting," and on 19 October 2021, the Chief District Court Judge noticed the TPR hearing for 21 February 2022.

The TPR hearing was held 21 February 2022. Father's arguments on appeal only address the adjudicatory phase of the hearing. During the adjudicatory phase of the hearing, Father testified that at the time, in August 2019, when he was having his mental health crisis, he was not aware of the return hearing for the *ex parte* order, but later he did become aware of the Order Suspending Visitation entered 28 August 2019. Father then testified that although he did not personally schedule anything with the trial court to resume visitation, as directed in the Order Suspending Visitation, he did attempt to resume visitation by communicating with Mother through his attorney.

Father testified he thought "there was a no[-]contact order in place" and he "did not want to violate that order, so what [he] did was just try to make sure everything was done with [his] mental health so [he] could get documentation proving that [he was] not a threat to [his] child." Father also testified he believed the Order Suspending Visitation was similar to a domestic violence protective order, and Mother "advised [him] that there was a no[-]contact order in place[,]" which is why he attempted to work with his attorney to resume visitation and never reached out to Mother directly. Father testified he had not attempted to send gifts or otherwise contact Sidney while he recovered from his mental health crisis and confirmed by the

time of the hearing it had been approximately 18 months since he had contact with Sidney.

Mother testified she had not heard from Father since he was released from the hospital in August 2019. Mother testified her contact information had not changed since the last time she spoke to Father and that Father had also been provided Mother's sister's contact information that he could use to reach out to contact Mother. Mother then testified she had heard from Father as part of the TPR proceedings in July 2020.

As to the Order Suspending Visitation, Mother confirmed she spoke with Father and "let him know that there was an order in place and he had to contact the county case worker that was assigned to the case and that they were trying to locate him." Mother also testified the Order Suspending Visitation was not a no-contact order and Mother "told [Father] that he would have to go through the county case worker and through court to file the motion" to resume visitation with Sidney. Mother then testified she was told about the July 2020 email from Father's attorney; the email said Father was "looking to resume visits;" and the email was received prior to her filing of the Petition.

Less than 30 days following the hearing, as required by North Carolina General Statute § 7B-1109, on 18 March 2022, the trial court entered an order terminating Father's parental rights (the "TPR Order"). The TPR Order makes adjudicatory findings of fact addressing the Custody Order and Father's attempted

- 9 -

suicide. The TPR Order also finds as fact that Father made no efforts to contact Mother since 2019, even though Father had contact information for Mother, and Father's attorney did contact Mother's attorney in July 2020. The trial court also found Father had resumed paying child support upon returning to work.

The trial court ultimately found evidence did not exist to support termination of Father's parental rights on the grounds he failed to pay child support or that Father was incapable of providing for the care and supervision of Sidney. The trial court did conclude Father's parental rights should be terminated "[p]ursuant to [North Carolina General Statute §] 7B–1111(a)(7), [because Father] ha[d] willfully abandoned [Sidney] for at least six consecutive months immediately preceding the filing of th[e] petition based upon" the trial court's findings and Father's statements at the TPR hearing and also because "[f]or at least the six (6) months preceding the filing of the Petition, [Father] withheld his presence, love, and care from the child." The Order then makes dispositional findings and concludes Father's parental rights should be terminated. Father filed notice of appeal 21 April 2022.

## II.    Jurisdiction

Father filed a Petition for Writ of Certiorari with this Court stating his notice of appeal was untimely, but also noting no certificate of service was attached to the trial court's TPR Order. The record does not contain a certificate of service attached to the TPR Order so our record does not provide the date Father was served with the TPR Order. Father also noted "[o]ur Juvenile Code requires that both [Father] and

his trial counsel sign the notice of appeal[,]" *see* N.C. Gen. Stat. § 7B-1001(c) (2022); N.C. R. App. P. 3.1(a), otherwise this Court is without jurisdiction to hear an appeal from a termination of parental rights. *See In re L.B.*, 187 N.C. App. 326, 331-32, 653 S.E.2d 240, 244 (2007). The signature date on Father's notice of appeal is 12 April 2022. Father asserts he and his trial counsel met on 12 April 2022 to sign the notice of appeal and he had no control over trial counsel's actions after he signed the notice of appeal; the potentially late filing is therefore no fault of his own.

North Carolina General Statute § 7B-1001(b) requires notice of appeal to "be made within 30 days after entry *and service* of the order" appealed from. N.C. Gen. Stat. § 7B-1001(b) (2022). However, there is no indication in the record when Father was served the 18 March 2022 TPR Order. If the TPR Order was served between 18 March 2022 and 20 March 2022, then Father's 21 April 2022 notice of appeal was untimely. If Father was served after 21 March 2022, then Father's 21 April 2022 notice of appeal was timely.

We have considered the gravity of termination of Father's parental rights and Father's assertion that he timely met with his counsel and signed the notice of appeal. In addition, if Father's appeal was actually filed late, the greatest period by which Father's appeal could be untimely was the short, 3-day difference between 18 April 2022 and 21 April 2022. In an abundance of caution and in our discretion we allow Father's Petition for Writ of Certiorari. *See generally* N.C. R. App. P. 21; *see also State v. Gardner*, 225 N.C. App. 161, 165, 736 S.E.2d 826, 829 (2013) ("We have also

held that where a [respondent] has lost his right of appeal through no fault of his own, but rather as a result of the actions of counsel, failure to issue a writ of *certiorari* would be manifestly unjust.").

### III.   Father's Appeal

Our Juvenile Code establishes a two-stage framework for the termination of parental rights; the first stage is adjudicatory and the second dispositional. *See* N.C. Gen. Stat. §§ 7B-1109, 1110 (2020). Father only challenges the adjudication of Sidney as abandoned, and his sole argument on appeal is that "[t]he trial court reversibly erred in concluding the existence of the ground of abandonment to terminate [Father]'s parental rights because the evidence failed to support the findings of fact and the findings of fact failed to support this conclusion of law." For the reasons below, we disagree and affirm the trial court's TPR Order.

### A. Standard of Review

At the adjudicatory stage, "[t]he standard of review in termination of parental rights cases is whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law." *In re C.M.P.*, 254 N.C. App. 647, 654, 803 S.E.2d 853, 858 (2017) (quotation marks omitted). "If the trial court's findings of fact are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary." *Id.* (quotation marks omitted). "Unchallenged findings of fact are conclusive on appeal and binding on this Court." *Id.* (quotation marks omitted). The

trial court's conclusions of law are reviewed *de novo*.  *Id.* (citation omitted).

## B. Abandonment of a Juvenile

The trial court terminated Father's parental rights pursuant to North Carolina General Statute § 7B-1111(a)(7) for willfully abandoning Sidney at least six months before the Petition was filed.  North Carolina General Statute § 7B-1111(a)(7) provides that:

> (a) The court may terminate the parental rights upon a finding of one or more of the following:
>
> . . . .
>
> (7) The parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion[.]

N.C. Gen. Stat. § 7B-1111(a)(7) (2020).

Our Supreme Court has further defined willful abandonment:

> We have held that "[a]bandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child."  *In re Young*, 346 N.C. 244, 251, 485 S.E.2d 612, 617 (1997) (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 275, 346 S.E.2d 511, 514 (1986)); *see also Pratt v. Bishop*, 257 N.C. 486, 502, 126 S.E.2d 597, 608 (1962) ("Abandonment requires a wil[l]ful intent to escape parental responsibility and conduct in effectuation of such intent.").  "It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wil[l]fully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child."  *Id.* at 501, 126 S.E.2d at 608.

*In re E.H.P.*, 372 N.C. 388, 393, 831 S.E.2d 49, 52 (2019).  "In this context, the word

[']willful' encompasses more than an intention to do a thing; there must also be purpose and deliberation. Whether a biological parent has a willful intent to abandon his child is a question of fact to be determined from the evidence." *In re A.K.D.*, 227 N.C. App. 58, 61, 745 S.E.2d 7, 9 (2013) (quotation marks omitted). But, "[a] delinquent parent may not dissipate at will the legal effects of his abandonment by merely expressing a desire for the return of the abandoned juvenile." *In re C.J.H.*, 240 N.C. App. 489, 504, 772 S.E.2d 82, 92 (2015) (citation omitted).

Further, "'[a]lthough the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions, the "determinative" period for adjudicating willful abandonment is the six consecutive months preceding the filing of the petition.'" *In re N.D.A.*, 373 N.C. 71, 77, 833 S.E.2d 768, 773 (2019) (quoting *In re D.E.M.*, 257 N.C. App. 618, 619, 810 S.E.2d 375, 378 (2018)). Here, because the Petition was filed 24 July 2020, the relevant six-month period for purposes of North Carolina General Statute § 7B-1111(a)(7) was 24 January 2020 to 24 July 2020. *See* N.C. Gen. Stat. § 7B-1111(a)(7).

We first address the findings of fact Father specifically challenges as unsupported by the evidence presented at the TPR hearing. This Court reviews the challenged findings for whether they "are supported by clear, cogent and convincing evidence[, and] . . . [i]f the trial court's findings of fact are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary." *In re C.M.P.*, 254 N.C. App. at 654, 803 S.E.2d at 858 (citation and

quotation marks omitted).

### 1. *Finding 14*

Finding 14 states: "In July 2020, an attorney for [Father] contacted the attorney for [Mother]." Father asserts finding 14 is "erroneous as a matter of law because it fails to include the reason for the July 2020 [email]," and the reason for the email, that Father wanted to resume visits, "negated the TPR ground of abandonment."

We first note a copy of this email is not in the record on appeal. However, Mother testified about an email from July 2020:

> [Father's Counsel]: Did your attorney communicate when she received communications in your case from either a party or an attorney?
>
> [Mother]: Yes.
>
> [Father's Counsel]: And were you made aware of an e-mail that was sent in July?
>
> [Mother]: I believe it was -- she attached it, or there was a forward in there, so yes.
>
> [Father's Counsel]: Did you (inaudible) an e-mail?
>
> [Mother]: Yes
>
> [Father's Counsel]: On [Father's] behalf about re-starting visitation?
>
> [Mother]: It was sent through the -- I think what the e-mail said was he's looking to resume visits, yes.
>
> [Father's Counsel]: Okay. And when did you get that in comparison to when you filed the TPR?

[Mother]: That was all in July.

[Father's Counsel]: And did you get the e-mail before you filed the TPR?

[Mother]: Yes.

After this exchange, Mother admitted her response after receiving the email was to file the Petition. This exchange is the only reference in the entire record to the substance of an email in July 2020 in which Father sought to resume visits with Sidney.

Finding 14 is supported by the evidence, as Father's attorney did contact Mother's attorney by email. But the sole evidence indicating this email had anything to do with visitation is Mother's uncertain statement: "I think what the e-mail said was he's looking to resume visits, yes." Father did not testify about the substance of the email sent in July 2020; he only testified about general contact with his attorney "about getting everything started back up for my visitation." And, as stated above, the email was not presented to the trial court and is not in the record for this Court to review.

Father's argument that finding 14 "is woefully inadequate in that it fails to indicate the nature of the July 2020 [email] contact" is without merit. The trial court has the duty of evaluating the weight and credibility of the evidence, *see, e.g.*, *In re K.W.*, 282 N.C. App. 283, 290, 871 S.E.2d 146, 152 (2022) (citation omitted), and in a TPR case, before making a finding of fact, the trial court must be sufficiently satisfied

with the evidence to be able to find the facts by clear, cogent, and convincing evidence. *In re B.C.B.*, 374 N.C. 32, 35, 839 S.E.2d 748, 751 (2020). Considering the minimal evidence that the email was regarding visitation, the trial court's finding is proper. The finding acknowledges there was a contact between the parties' attorneys and the trial court did not have any obligation to address the nature of the July 2020 contact further.

### 2. *Findings 12 and 21*

Father next disputes findings 12 and 21 because "[t]hese two findings are contradicted by finding of fact #14[.]" Finding 12 states, "[Father] did not make any further efforts to contact [Mother]." Finding 21 states, "Other than the one phone call to [Mother] in August 2019, [Father] did not attempt to contact [Mother] to set up a visit or to check on the child."

Finding 12 is not inconsistent with finding 14. Finding 12 immediately followed finding 11, which was unchallenged on appeal and stated:

> [Father] called [Mother] one time in August 2019 after he was released from the hospital. [Mother] informed him that there was a new custody order in place and indicated that he should contact the social worker handling the Department of Social Services case.

Finding 11 summarizes the direct contact between Father and Mother since Father's mental health crisis. When read in context, finding 12 builds on the context from finding 11, and there was "ample, competent evidence[,]" *In re C.M.P.*, 254 N.C. App. at 654, 803 S.E.2d at 858, to support a finding that Father did not attempt to directly

call or contact Mother to seek visitation with Sidney between August 2019 and July 2020.

At trial, Father testified he believed a no-contact order was in place. Father also testified he was never served with a no-contact order, and he believed the Order Suspending Visitation was a no-contact order because he did not read the order thoroughly enough. The Order Suspending Visitation was in evidence and it has no provisions barring Father from contact or communication with Mother or Sidney; it only suspends his visitation set by prior order "until such time as he presents himself to the Court and shows just cause as to why his visits should be reinstated." When questioned on his contact with Mother, Father admitted he never texted or called Mother, although he had her contact information; Father agreed he never "tried to send any cards or gifts or letters[;]"and Father agreed he never "tried to communicate with [Mother] in any way about [Sidney's] well[-]being over the last couple years[.]"

Mother testified that she had not heard from Father since August 2019, her contact information had not changed, and he was not blocked from communicating with her in any way. Similar to finding 14, the only evidence that Father contacted Mother regarding *anything* to do with Sidney is an equivocal statement by Mother that she heard from Father in July of 2020 and she thought Father had expressed a desire to resume visitation. The evidence in the Record is sufficient to support finding 12, and finding 12 does not contradict finding 14. Finding 21 is not erroneous for the same reasons. There was competent evidence to support the trial court's findings

that Father did not attempt to contact Mother between August 2019 and July 2020 regarding Sidney's welfare.

### 3. *Finding 25*

Finding 25 states: "At the time of the filing of the Petition, it had been eleven (11) months since the [Father] had visited with the child or communicated with the [Mother] about her well-being, a fact which he admits." Father asserts this finding is erroneous for the same reasons as findings 12, 14, and 21. Father asserts his attorney's email contained a request for visitation and "[s]uch a contact was tantamount to a communication with [Mother] about Sidney's well-being." We disagree. We have already addressed all the evidence regarding the substance of the email, which is minimal. There was no evidence Father requested any information about Sidney's health, development, or welfare. At most, the email between the parties' attorneys was Father "merely expressing a desire for the return of the abandoned juvenile." *In re C.J.H.*, 240 N.C. App. at 504, 772 S.E.2d at 92. For the reasons discussed above, this finding is supported by the evidence.

### 4. *Conclusions of Law*

Father then challenges finding 36 and asserts finding 36 is actually a conclusion of law because "it mirrors the language from the TPR statute on the abandonment ground." We agree and will review finding 36, as well as the trial court's other conclusions, *de novo*. *In re C.M.P.*, 254 N.C. App. at 654, 803 S.E.2d at 858; *see also In re Helms*, 127 N.C. App. 505, 510-11, 491 S.E.2d 672, 675-76 (1997)

("[A]ny determination requiring the exercise of judgment, . . . or the application of

legal principles, . . . is more properly classified a conclusion of law.").

Finding 36 states:

> 36.    That the Court finds by clear, cogent and convincing evidence that the following grounds exist to terminate the parental rights of [Father] . . . :
>
> > a.  Pursuant to 7B–1111(a)(7), [Father] has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of this petition based upon the previously stated Findings of Fact and [Father]'s own admission.
> >
> > b.  For at least the six (6) months preceding the filing of the Petition, [Father] withheld his presence, love, and care from the child.
> >
> > c.  The Court specifically reviewed the Supreme Court of North Carolina's ruling in 372 N.C. 388 *In the Matter of E.H.P. and K.L.P.* filed August 16, 2019 in which a termination of parental rights was upheld even with a no-contact order actually in place.

The trial court ultimately concluded:

> 3.    That by clear, cogent and convincing evidence [Father]: has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition as set forth in § 7B–1111[(a)](7).

Father's conduct met the statutory standard for willful abandonment under North

Carolina General Statute § 7B-1111(a)(7), and these conclusions were not made in

error.

By Father's own admission, he had no contact with Sidney during the six

months preceding the filing of the Petition. Father made no effort to inquire about Sidney's welfare, either before or after the Petition was filed, even though he had current contact information, and he was not blocked from communicating with Mother. It is unfortunate he did not read the Order Suspending Visitation well enough to realize it was not a "no[-]contact" order particularly because the order set forth what he needed to do to resume visitation. And although the trial court must consider Father's conduct during the six months *preceding* the filing of the petition determinative, "the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions." *In re N.D.A.*, 373 N.C. at 77, 833 S.E.2d at 773. During a time period of over thirty months from August 2019, when Father was released from the hospital, until the TPR hearing in February 2022, Father's sole attempts at contact or communication with Mother or Sidney were the one phone call to Mother in August 2019 and the July 2020 email from his attorney to Mother's attorney.

Father's admission to not fully reading the Order Suspending Visitation cuts both ways. The trial court could have believed Father acted reasonably when he did not seek to see Sidney based upon his erroneous belief he was subject to a no-contact order. Father argues the trial court should have interpreted the evidence in this manner, and our dissenting colleague would agree. Or the trial court could infer–and did infer–Father was not sufficiently motivated or interested in resuming contact with Sidney even to take a few moments to read the Order Suspending Visitation

carefully, even though he admittedly knew the order addressed custody of his child. On the one occasion Father contacted Mother in August 2019, Mother told Father that he simply needed to contact the county official managing Sidney's case and show the trial court that he had adequately recovered from his mental health crisis and then Father would be able to resume visits with Sidney. Mother's comments to Father were consistent with the provisions of the order, which noted that "[t]he Cabarrus County Department of Social Services ["DSS"] has opened an investigation and has been unable to locate the [Father]; . . . [Father]'s mental stability is in question and it would be contrary to the minor child's best interest for him to have visitation at this time[;]" and "visitation with the minor child [Sidney] is suspended until such time as he presents himself to the Court and shows just cause as to why his visits should be reinstated." But Father did not contact Cabarrus County DSS and did not present himself to the trial court to demonstrate he had recovered sufficiently to resume visitation, although he testified that he had stopped seeing his therapist and returned to work in March 2020–four months prior to the filing of the Petition. Father also testified he did not attempt to file a motion to resume visitation with Sidney with the trial court until September 2020, several months after the Petition was filed.

The trial court's findings were sufficient to support the conclusion that Father willfully abandoned Sidney. The trial court's findings addressed Father's mental health crisis, his contact with Mother in August 2019, his receipt of the Order

Suspending Visitation, his failure to attempt to contact Mother again, and his failure to take any other action to resume visitation or even to send a card or a gift to the child, even though he was not prohibited from doing so.

We conclude the trial court's findings support its conclusion of abandonment as defined by § 7B-1111(a)(7). *See In re C.M.P.*, 254 N.C. App. at 654, 803 S.E.2d at 858. Because Father did not challenge the dispositional portion of the TPR hearing, we do not review the trial court's dispositional findings and conclusions.

## IV.  Conclusion

The trial court's adjudicatory findings are supported by clear, cogent, and convincing evidence and were not made in error. These findings support the trial court's conclusions of law. The trial court's termination of Father's parental rights is affirmed.

AFFIRMED.

Judge ARROWOOD concurs.

Judge TYSON concurs in part and dissents in part.

No. COA22-503 – *In re: S.I.D.-M.*

TYSON, Judge, concurring in part and dissenting in part.

I concur to allow Father's Petition for Writ of *Certiorari*. *See* N.C. R. App. P. 21. "We have also held that where a [respondent] has lost his right of appeal through no fault of his own, but rather as a result of the actions of counsel, failure to issue a writ of *certiorari* would be manifestly unjust." *State v. Gardner*, 225 N.C. App. 161, 165, 736 S.E.2d 826, 829 (2013). Father's appeal is properly before us.

In this private termination of parental rights petition ("TPR") brought by Mother, I also agree the trial court correctly found and concluded Mother's evidence did not support her asserted TPR grounds alleging Father had failed to pay child support or that Father was incapable of providing for the care and supervision of his daughter, Sidney, to terminate Father's parental rights.

The sole basis the trial court found to support Mother's petition to terminate Father's parental rights was "[p]ursuant to [N.C. Gen. Stat. §] 7B-1111(a)(7), [on the grounds Father] ha[d] willfully abandoned [Sidney] for at least six consecutive months immediately preceding the filing of th[e] petition based upon" the trial court's findings and Father's statements at the TPR hearing and also because "[f]or at least the six (6) months preceding the filing of the Petition, [Father] withheld his presence, love, and care from the child."

Father challenges the adjudication of Sidney as being "abandoned" and argues "[t]he trial court reversibly erred in concluding the existence of the ground of abandonment to terminate [Father]'s parental rights because the evidence failed to

support the findings of fact and the findings of fact failed to support this conclusion of law." I agree with Father that Mother has failed to carry her burden and to prove Father's abandonment by clear, cogent, and convincing evidence. I respectfully dissent.

## I.  Standard of Review

Mother, as petitioner, carries and maintains the burden of proof. "The standard of review in termination of parental rights cases is whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law." *In re C.M.P.*, 254 N.C. App. 647, 654, 803 S.E.2d 853, 858 (2017) (citations and quotation marks omitted). The trial court's conclusions of law are reviewed *de novo* on appeal. *Id.* (citation omitted).

Our Supreme Court has recently held:

> While the question of willful intent is a factual one for the trial court to decide based on the evidence presented, and while the trial court's factual determination is owed deference, it remains [the appellate court's] responsibility as the reviewing court to examine whether the evidence in the case supports the trial court's findings and whether, as a legal matter, the trial court's findings support its conclusions of law.

*In re B.R.L.*, 379 N.C. 15, 18, 863 S.E.2d 763, 767 (2021) (citations omitted).

## II.  Analysis

While Father was undergoing medical treatment, Mother sought and secured an *ex parte* custody order suspending Father's visitation with his daughter on 13

August 2019. Mother also filed a motion to modify visitation. The trial court entered a written order on 28 August 2019 extending the *ex parte* order and suspended Father's visitation (the "Order Suspending Visitation") until Father "presents himself to the Court and shows just cause as to why his visits should be reinstated." Less than a year later and after Father had twice contacted Mother to resume visitation with his daughter, Mother filed a "Petition for Termination of Parental Rights" on 24 July 2020.

Father's answer was filed 10 September 2020. He admitted the allegations regarding the parties' and child's residences, the parties' status as parents of the child, the prior custody action, and Mother's *ex parte* petition pre-emptively seeking the Order Suspending Visitation.

The record shows the court appointed a Guardian *ad litem* ("GAL") on 15 September 2020, and the scheduled hearing was continued until 27 October 2020. During this time, and while the Order Suspending Visitation prevented visitation between Father and his daughter, Sidney, the Termination of Parental Rights hearing was inexplicitly and repeatedly continued before ultimately being held on 21 February 2022. The order from the hearing was entered 18 March 2022.

Mother's pre-emptive *ex parte* Order has succeeded in denying Father of visitation with Sidney for nearly four (4) years. Mother testified her husband, Sidney's step-father, plans to adopt Sidney "immediately" if and after Father's parental rights were terminated. ("Yes, we'd like to do [an adoption] immediately.").

3

Father's persistence to maintain his parental rights in the face of Mother's repeated efforts to exclude him from his daughter's life clearly demonstrates he did not and has no intent to willfully "abandon" her. *In re B.R.L.*, 379 N.C. at 18, 863 S.E.2d at 767. The majority's opinion asserts "the Petition was filed 24 July 2020, [and] the relevant six-month period for purposes of North Carolina General Statute § 7B-1111(a)(7) was 24 January 2020 to 24 July 2020. *See* N.C. Gen. Stat. § 7B-1111(a)(7)."

The record is clear Mother did everything she could to deny Father of any contact with his daughter and calculated to take deliberate advantage of Father's mental illness. Immediately after Father's release, undisputed evidence shows and the trial court found Father directly contacted Mother to resume his visitation. Mother testified and admitted Father had communicated with her regarding resuming visitation and she had "let him know that there was an order in place and he had to contact the [DSS] county case worker that was assigned to the case and that they were trying to locate him."

Mother also testified and admitted she had "told [Father] that he would have to go through the county case worker and through court to file the motion" to resume his visitation with Sidney. Mother also admitted she knew or was told about the July 2020 email from Father's attorney, the email said Father was "looking to resume visits," and the email was received prior to her filing the Petition.

Father correctly argues finding of fact 14 is "erroneous as a matter of law because it fails to include the reason for his attorney's July 2020 [email]," his

4

retaining of counsel to resume visitation, and the reason for the email asserting Father wanted to resume visits, "negated the TPR ground of abandonment" under the statute. Mother expressly admitted during cross-examination by Father's attorney that she had received written notice from Father or his attorney in July 2020, expressing Father's desire to resume visitation with Sidney. Mother's response after receiving the email was to file the private TPR Petition before us.

In addition, both parties reference a motion Father made in September 2020 to attempt to resume visitation. The trial court's TPR order also expressly references this motion.

Here, Mother's evidence does not support the trial court's finding that Father "willfully abandoned" Sidney during the relevant six-month period. *In re B.R.L.*, 379 N.C. at 18, 863 S.E.2d at 767. "Abandonment requires a wil[l]ful intent to escape parental responsibility and conduct in effectuation of such intent." *Pratt v. Bishop*, 257 N.C. 486, 502, 126 S.E.2d 597, 608 (1962) (citation omitted). "It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection, *and* wil[l]fully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Id.* at 501, 126 S.E.2d at 608 (citation omitted) (emphasis supplied).

"To find that a parent has willfully abandoned his or her child, the trial court must 'find evidence that the parent deliberately eschewed his or her parental responsibilities *in their entirety.*" *In re A.L.L.*, 376 N.C. 99, 110, 852 S.E.2d 1 (2020)

(emphasis supplied) (quoting *In re E.B.*, 375 N.C. 310, 318, 847 S.E.2d 666, 673 (2020)). The trial court's rejection of Mother's allegations that Father had failed to pay child support or that Father was incapable of providing for the care and supervision of his daughter, Sidney, also supports Father's claim he had not willfully "eschewed his . . . parental responsibilities *in their entirety*." *Id.* (emphasis supplied).

Our Supreme Court has held: "Abandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re Young*, 346 N.C. 244, 251, 485 S.E.2d 612, 617 (1997) (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 275, 346 S.E.2d 511, 514 (1986)). This Court has held: "[i]n this context, the word 'willful' encompasses more than an intention to do a thing; *there must also be purpose and deliberation*." *In re A.K.D.*, 227 N.C. App. 58, 61, 745 S.E.2d 7, 9 (2013) (quotation marks omitted)(emphasis supplied).

The trial court's conclusion to terminate Father's parental rights is not supported by its findings of fact of either "willful" *and* "*purpose and deliberation*" of Father's intent to abandon Sidney. *Id.*

Under the statute, "the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions, [but] the 'determinative' period for adjudicating willful abandonment is the six consecutive months preceding the filing of the petition." *In re N.D.A.*, 373 N.C. 71, 77, 833 S.E.2d 768, 773 (2019) (quotation marks omitted) (quoting *In re D.E.M.*, 257 N.C. App. 618,

6

619, 810 S.E.2d 375, 378 (2018).

Father's arguments have merit. Mother failed to carry her burden to produce clear, cogent, and convincing evidence to support the trial court's findings. As such on *de novo* review, the trial court's conclusions of law are unsupported by the findings of fact and are erroneous and prejudicial. *In re B.R.L.*, 379 N.C. at 18, 863 S.E.2d at 767.

Father also disputes findings of fact 12 and 21 and argues "[t]hese two findings are contradicted by finding of fact # 14[.]" Finding of fact 12 states: "[Father] did not make any further efforts to contact [Mother]." Finding of fact 21 states: "Other than the one phone call to [Mother] in August 2019, [Father] did not attempt to contact [Mother] to set up a visit or to check on the child." As noted above, the undisputed evidence and testimony clearly shows otherwise.

The majority's assertion "the trial court must be sufficiently satisfied with the evidence to be able to find the facts by clear, cogent, and convincing evidence" misstates this Court's standard of review by summarily affirming its conclusion to terminate Father's parental rights for abandonment of his daughter. That conclusion is not based upon clear, cogent, and convincing evidence and findings. *See Id.* In light of Mothers failure to carry her burden, Father's constitutionally-protected parental rights prevail and must be preserved. *Id.*

### III.    Conclusion

I concur to allow Father's PWC and to affirm the trial court's conclusions that

7

*TYSON, J., concurring in part and dissenting in part*

Father supported his daughter and of him being a fit and proper parent to resume visitation with his child.

Mother's undisputed motives, admitted actions, and her failure to carry her burden under the statute, considered together with Father's undisputed efforts to make repeated contacts, and retaining counsel to preserve his parental rights, compels reversal. The trial court's adjudicatory findings are not supported by clear, cogent, and convincing evidence and its conclusions are affected by error. *Id.* These findings do not support the trial court's conclusions of law to terminate Father's constitutionally-protected parental rights based solely on Father's abandonment.

The trial court's TPR order, based solely on the grounds of Father's "willful abandonment", is affected by error and is properly reversed. *Id.* I respectfully dissent.